[Civ. No. 4064. Third Appellate District.—May 24, 1930.]

BARTHOLOMAE OIL CORPORATION (a Corporation), Respondent, v. OREGON OIL & DEVELOPMENT COMPANY (a Corporation), Appellant.

Bradner W. Lee, Jr., Kenyon F. Lee and Hare & Walden for Appellant.

Joseph E. Bien and Werner Olds for Respondent.

THOMPSON (R. L.), J.—This is an appeal from a judgment for the plaintiff for $62,978.79 and interest for sinking an oil-well pursuant to contract.

The plaintiff is a corporation engaged in drilling oil-wells. August 24, 1923, it was occupied in sinking an oil-well on certain lots at Signal Hill, Los Augeles County. The well

had reached a depth of 2,028 feet. W. R. McDonald then purchased the lease of the property. A written contract with McDonald was executed on the last-mentioned date by the terms of which the well was to be completed by the plaintiff. This contract and lease were subsequently assigned to the defendant. The well was called "Bartholomae No. 4." By the terms of this contract the plaintiff agreed to continue the drilling of the well by means of its rotary drilling equipment "with reasonable diligence until a depth of 4,500 feet has been attained therein unless petroleum in paying quantities shall have been found therein at a lesser depth." In the event oil was not produced before the well had reached a depth of 4,500 feet, it was provided the plaintiff should continue drilling the well to a depth "desired by the owner." In an amendment to the contract executed by the interested parties on January 8, 1924, it was stipulated the owner, at any point below the depth of 4,500 feet could stop the drilling by giving the plaintiff written notice therefor. Upon receiving this notice the plaintiff agreed to "immediately cease drilling and to land the oil string at the point selected by the owner."

As a consideration for the service of drilling the well to this specific depth, it was stipulated the plaintiff should receive the sum of $110,000 to be paid in installments. It was provided that in the event the owner exercised its option to require the drilling to be continued below 4,500 feet, the plaintiff was to receive in addition to the foregoing payments the sum of $400 per day thereafter, together with the cost of all "pipe equipment used." It was further provided that "all fishing and sidetracking" performed by the plaintiff below the 4,500-foot level should be "at actual cost and in no event shall exceed $235 per day," in lieu of the $400 per day above provided for while engaged in drilling the well. The contract is silent with respect to the time for the payment of the $400 *per diem* as compensation for drilling below the 4,500-foot level. The contract also gave the defendant an option to either pay in cash the last installment in compensation for drilling the first 4,500 feet "within ten days after the well shall have been completed and put on production," or in lieu thereof settle this obligation by applying seventy-five per cent of the proceeds derived from the sale of petroleum until it was fully paid. If this final

installment were promptly paid without the delay of waiting for the proceeds from the sale of oil, $40,000 would be accepted in full compensation for the $45,000 installment.

February 29, 1924, the drilling of the well reached a depth of 4,500 feet without striking oil. March 10, 1924, the defendant notified the plaintiff in writing to continue the boring of the well "until ordered to cease drilling." May 8, 1924, a depth of 5,054 feet was reached. The defendant then notified the plaintiff in writing "not to make any more hole after the core at 5,055 feet and (this) authorizes you to place the well on production." Upon receipt of the last-mentioned notice the plaintiff ceased drilling and began preparation for production of the well. This operation required the procuring of materials and equipment for that purpose and consumed several days' time. In this process of preparing the well for production some seventeen cores or tests of soil were taken from the well and analyzed by experts for evidence of the presence of petroleum. Oil in commercial quantity was, however, not developed. In spite of the fact that the well was fully prepared for production it proved to be a "dry hole" and never developed oil. By July 14, 1924, all work ceased and the well was abandoned. The plaintiff had paid on account of the contract price for drilling, the aggregate sum of $96,163. This included $60,000 on account of the agreed cost for drilling the first 4,500 feet. The balance applied on the cost of materials furnished by the plaintiff and the $400 *per diem* as compensation for drilling below the 4,500-foot level. Demand was thereupon made of the defendant for the balance of the contract price, which was refused. This suit was then commenced. The defendant denied the material allegations of the complaint and filed a cross-complaint based upon an alleged breach of the contract on the part of the plaintiff, demanding the return of all money paid to the plaintiff.

Upon the trial findings were adopted by the court, which were against the appellant upon all the material issues and to the effect that plaintiff had proceeded to drill the well pursuant to contract with due diligence until a depth of 5,055 feet had been reached, when, upon written demand of the defendant, the drilling ceased, and the well was then prepared for production; that the plaintiff performed

all the covenants of the contract on its part, completed the well and prepared it for production, but that neither gas nor oil was developed; that under the terms of the contract there was due the plaintiff:

For drilling the well below the depth of 4,500 feet .....................................$43,316.65
For fishing and side-tracking.................... 4,778.33
For additional pipe and equipment furnished..... 1,592.75

Total for drilling below the 4,500-foot level.$49,687.73
Less amount paid on the foregoing items......... 31,708.94

Balance due for drilling below 4,500-foot level .............................$17,978.79
Balance due for drilling to the 4,500-foot level... 45,000.00

Total amount due as per contract.......$62,978.79

Judgment was rendered for this sum, together with legal interest from the date of demand for payment of the balance of the contract price.

■ The chief contention of the appellant is that the final payment of $45,000 for the first 4,500 feet of drilling was, by the terms of the contract, made conditional upon producing oil in commercial quantity. We cannot agree with this construction of the contract.

The portion of the contract upon which the appellant relies for its construction is as follows:

"The contractor (plaintiff) covenants . . . to drill and complete a certain well for the production of petroleum, . . . (operating) with reasonable diligence until a depth of 4500 feet has been attained therein, unless petroleum in paying quantities shall have been found therein at a lesser depth. A well producing oil in paying quantities for the purpose of this agreement shall be deemed a well which produces not less than an average of 500 barrels . . . in twenty-four hours continuous pumping or flow, during a period of thirty days. . . .

"The owner covenants and agrees to pay to the contractor as compensation for the drilling of said well the sum of One Hundred and Ten Thousand (110,000) Dollars, . . . in instalments as follows:

"(a) Twenty Thousand (20,000) Dollars on the signing of this contract.

"(b) Twenty-five Thousand (25,000) Dollars on or before the 10th day of September, 1923.

"(c) Ten Thousand (10,000) Dollars upon the setting of the water string.

"(d) Five Thousand (5,000) Dollars upon landing the oil string.

"(e) Five Thousand (5,000) Dollars upon placing the well on production.

"(f) The sum of Forty Thousand (40,000) Dollars within ten days after said well shall have been completed and put on production."

Two installments in compensation for the first 4,500 feet of drilling remained unpaid, viz.: "(e) Five Thousand (5,000) Dollars upon placing the well on production," and "(f) The sum of Forty Thousand (40,000) Dollars within ten days after said well shall have been completed and put on production." A provision of the contract gave the defendant an option to liquidate this last amount by paying in lieu thereof $40,000 in cash from the sales of oil, provided it was discovered, according to the evident intent of the parties.

The appellant contends that the language of the contract, including the provisions for the payment of these two last installments, should be construed to mean that the procuring of oil in commercial quantity became a condition precedent to the payment of the consideration.

It will be observed the plaintiff pursuant to this contract does not agree to complete the well *and produce petroleum*. It merely agrees to "complete a certain well [so that it may be used] for the production of petroleum." The final payment for the first 4,500 feet was not declared due *if* or *only in the event* that petroleum was produced. The contractor covenanted to drill the well to a depth of 4,500 feet for the definite and fixed sum of $110,000 payable in installments. The last payment of $40,000 was not conditional or uncertain. The time for the payment of this installment, however, was uncertain. It was to be paid upon the happening of an anticipated event, to wit, the producing of oil. Unfortunately, this event did not occur. The defendant, like many miners who seek for treasures in

the recesses of the earth, was doomed to disappointment. The contract did not provide that this installment would not become due *unless* the plaintiff developed oil. The failure to produce oil was not the fault of plaintiff. Possibly the sinking of the well to a lower depth might have resulted in striking oil. The drilling was stopped solely upon the written directions to that effect from the defendant.

When the consideration for labor or materials is definite and certain, but the time for the payment thereof is uncertain or dependent upon the happening of an event which fails through no fault of the contractor, the consideration does not fail, but becomes due within a reasonable time. (21 R. C. L. 11, sec. 5; *Rosenheim* v. *Houze,* 179 Cal. 309 [176 Pac. 456]; *Wallace* v. *Carlin,* 92 Cal. App. 31 [267 Pac. 596].)

The contract in the present case, so far as it relates to the drilling of the first 4,500 feet was entire and not severable. This appears, from the agreement, to have been the intent of the parties. It was a covenant to pay a gross sum for sinking the well to that depth, in spite of the fact that installments were payable as the work progressed.

Ordinarily, when one party contracts to do certain work or perform certain services and the other party agrees to pay a specified price therefor, the contract is to be regarded as entire. (13 C. J. 561, sec. 525.) Such a contract is not severable merely because the installments are made payable as the work progresses, or even because it is stipulated that the final payment is to be made from proceeds which may be expected to be derived as a result of the enterprise, provided it does not appear from the contract that the procuring of the anticipated result or securing proceeds from sales of the expected commodity is mutually intended by the parties to be a condition precedent to the payment of such installments. (13 C. J. 564, sec. 530.) From an examination of the contract in this case we are satisfied it was not the intent of the parties to make the actual development of oil, or the receipt of proceeds from the sale thereof, a condition precedent to the payment of any installments or portion of the consideration for drilling the well. "Courts are disinclined to construe stipu-

lations in a contract as conditions precedent, where to do so would result in injustice." (13 C. J. 569, sec. 539.)

It may not be contended there was a condition attached to the obligation to pay the agreed *per diem* compensation for drilling below the 4,500-foot level. No such condition is expressed or inferred. It is an unreasonable construction of the contract to hold that the first three or four installments were unconditional; that compensation for drilling below the 4,500-foot level was also unconditional, but that two of the intervening installments were intended to be conditioned and dependent upon the production of oil.

Nor is the appellant's construction of the contract aided by the paragraph which defines the meaning of the phrase "a well producing oil in paying quantity." This paragraph, which is relied upon by appellant, follows the covenant to drill the well with diligence to a depth of 4,500 feet "unless petroleum in paying quantities shall have been found therein at a lesser depth." This is followed by the explanation that "a well producing oil in paying quantities for the purpose of this agreement shall be deemed a well which produces not less than an average of 500 barrels . . . in twenty-four hours continuous pumping or flow, during a period of thirty days." This is not a guaranty to produce petroleum in paying quantity, or at all. It is a mere definition of what quantity of oil will be deemed to be adequate to warrant the plaintiff in ceasing to drill short of the 4,500-foot level.

The appellant's contention is without merit, to the effect that the plaintiff forfeited his claim to compensation for drilling the well because of his breach of the contract in failing to sink a new well within thirty days from the abandonment of "Bartholomae No. 4."

The contract provided: "If the contractor is unable to complete said well, *in accordance with the specifications, covenants and conditions* herein contained, the contractor shall within thirty (30) days from the abandonment of the first well, commence the drilling of a new well, in lieu of the first well . . ." The trial court found that the plaintiff performed all of the covenants of the agreement on its part. Unless it may be said that the contract contained a guaranty to produce oil in commercial quantity as a con-

dition precedent to the right of compensation for the drilling, the evidence amply supports the finding that the plaintiff fulfilled the covenants on his part. The obligation to drill another well depended solely upon plaintiff's failure to comply with the covenants with respect to the drilling of the first well.

The appellant asserts that a demand for the deferred payments was a prerequisite to maintaining the action and that the record is devoid of proof of such demand for the payment of the final installments for the first 4,500 feet of drilling. ■ Ordinarily, when there is an uncertainty regarding the time of payment, a demand is necessary. (35 Cyc. 264.)

■ In the present case the evidence is sufficient to show that a demand was duly made. Mr. Bartholomae testified in behalf of the plaintiff that he sent a statement of this demand for payment to the defendant. The production of this original demand was then requested of the defendant in open court during the trial. Upon denial that it had been received, the witness then produced a carbon copy thereof and testified that he mailed the original to the defendant July 12, 1924, by depositing it in the United States mail properly addressed, with the postage prepaid. The carbon copy was then received in evidence over the objection of the defendant. This constituted ample evidence of a demand. The defendant's denial that he received this demand through the mail merely created a conflict of evidence in that regard.

■ It is claimed the evidence shows that the plaintiff did not proceed with diligence to drill below the 4,500-foot level and that the employees were instructed to retard the work on account of the *per diem* basis. It is true that the cost per foot of drilling at the *per diem* rate greatly exceeded the contract price for the first 4,500 feet. This may be partially accounted for by the increased difficulty of drilling at a lower level. There is some testimony in support of the appellant's contention in this regard, but the evidence is conflicting upon this issue and we are, therefore, bound by the findings of the court.

While there is much controversy and conflict regarding nearly every item contained in the accounting adopted by the court in rendering its judgment, we are unable to say

that each amount is not adequately supported by competent evidence.

The judgment is therefore affirmed.

Finch, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 21, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 21, 1930.